# EXHIBIT B

ORIGINAL

Page 1

1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2       CIVIL ACTION NO. 2:09-cv-03766-JAG-MCA
3
4
5   ROGER FOUCHE,                    :
6           Plaintiff,               :    DEPOSITION OF:
7       vs.                          :    JOSEPH J. SULLIVAN
8   NEW JERSEY TRANSIT,              :
9           Defendant.               :
    _____X
10
11
12
13
14
15       TRANSCRIPT of testimony as taken by and
16   before SEVA FLICSTEIN, Certified Shorthand
17   Reporter, Registered Merit Reporter, Certified
18   Realtime Reporter, a Notary Public of the State
19   of New Jersey, at the LAW OFFICES OF CRANER,
20   SATKIN, SCHEER & SCHWARTZ, 320 Park Avenue,
21   Scotch Plains, New Jersey, on Monday, May 24,
22   2010, commencing at 10:33 in the forenoon.
23
24
25   Job No. NJ258593

Page 30

1  know?  How does it help the union?
2          A.   If you go back to the opening
3  part of the contract where it states that the
4  company controls the workforce, it kind of
5  gives the union stability as to its -- each of
6  its employees would have two days off per week
7  consecutive, in the first paragraph of that.
8          Q.   And how are those days off broken
9  up?  Does everybody get Saturday and Sunday
10 off?
11         A.   No.
12         Q.   Why not?
13         A.   There would be no buses on the
14 street on Saturday and Sunday if they gave
15 everybody off Saturdays and Sundays.
16         Q.   So by necessity, obviously, it
17 sounds like other days off -- some operators
18 get other days off during the week besides
19 Saturday and Sunday?
20         A.   To clear this up, it's a
21 seven-day, 24-hour, 365-day operation.
22         Q.   I certainly have heard that
23 phrase many times.
24              So when days off are split up,
25 does the union control how those days are split

```
 1        Q.    Why do you guys have this
 2   seniority system in the contract?
 3        A.    It's the only thing we have in
 4   the contract.  Glad you find that funny.
 5   That's the only thing we have.
 6        Q.    Explain that for me.  Why is that
 7   so important --
 8        A.    It's how you -- in any union
 9   position, your seniority is sacred to you.
10        Q.    Why is it sacred to unions?
11        A.    Like I said, it's the only thing
12   you have in the company, company seniority.
13   It's how you bid vacations, it's how you get
14   vacation, it's how you get your pay.
15   Everything in this contract is based on
16   seniority.
17        Q.    And what is the goal of the
18   seniority system?
19        A.    There is no goal; it is what it
20   is.
21        Q.    It is what it is?
22        A.    Yes.  If there was a goal, then
23   when you get to the top of the heap you would
24   get something more.  But I can get the same
25   thing if I'm the 25th man in the garage; I just
```

1  2008?
2       A.   Yeah.
3       Q.   But under no circumstances can
4  the union set aside a position for one of its
5  members that the rest of its union members
6  can't bid on?
7       A.   No.
8       Q.   Why not?
9       A.   It would be a contractual
10 violation of the seniority provision in the
11 collective bargaining agreement.
12      Q.   What would the union do if the
13 company unilaterally decided it wanted to
14 accommodate a bus operator or give a bus
15 operator a specific piece of work?  Forget the
16 religious aspect here.  Just say the company
17 wanted to give an operator its own piece of
18 work.  Could it do that without breaking the
19 agreement with the union?
20      A.   No.
21      Q.   What would happen if the company
22 did that?
23      A.   We would file a grievance, unfair
24 labor practice and a grievance.
25      Q.   Because we would be unilaterally

Page 50

```
 1   changing the terms of the contract?
 2        A.    Terms and conditions.
 3        Q.    The company and the union signed
 4   this contract, we both have to abide by it;
 5   right?
 6        A.    That's debatable.
 7        Q.    All joking aside, in theory;
 8   right?
 9        A.    I'm not joking.
10        Q.    You have too much time in here,
11   I'm still young and idealistic about this.
12        A.    38 years, you kind of figure out
13   what's going on.
14        Q.    But the theory is, you know, both
15   sides --
16        A.    -- are supposed to abide by the
17   collective bargaining agreement.
18        Q.    We disagree about what that
19   means, and of course there are grievances about
20   that, about determining the contract.  But you
21   are telling me, hard and fast, if we set aside
22   a run for a specific full-time operator, the
23   company did, only for that guy, that's a
24   violation of the contract, and you would grieve
25   that?
```

1  A. Yes.
2  Q. Because your membership would be
3  outraged, wouldn't they? They would be upset
4  that they didn't have a chance to bid on a
5  piece of work?
6  A. Yes, yes.
7  Q. Weekends off, is that a desirable
8  goal for most bus operators? Not all, but most
9  of them?
10 A. Majority, yes.
11 Q. We all want weekends off, right,
12 to play with our kids, go to ballgames,
13 whatever it is?
14 A. Depends.
15 Q. Not everyone?
16 A. No.
17 Q. But most of them. Do you think
18 that's fair?
19        MR. CRANER: It's not a question
20 of fairness, it's a question of contract.
21 A. If they want it, it should be
22 theirs. If it's there, they take it.
23 Q. That's why it's done by
24 seniority, right, because that's the only fair
25 way to make sure that schedules are set?

1   Q. Did the company ever ask you guys
2 to negotiate --
3   A. Yes.
4   Q. -- a religious accommodation
5 policy?
6   A. Yes, they did.
7   Q. And what was your response?
8   A. What the company wanted we could
9 not give them.
10   Q. You wanted the contract to be
11 whatever it was at that time, you didn't want
12 to negotiate a new religious accommodation
13 policy?
14   A. No, that's not true.
15   Q. What do you mean then?
16   A. The company wanted us to -- we'll
17 use Roger's case. If Roger would have taken
18 off Sunday, and his days off were Tuesday and
19 Wednesday, the company wanted him to come in on
20 either Tuesday or Wednesday and work for
21 straight time.
22   Q. So work another day --
23   A. Yes.
24   Q. -- work whatever his regular --
25   A. -- days off would have been.

Page 58

1  Q. At normal time?
2  A. At straight time.
3  Q. With no overtime?
4  A. With no overtime. Which would
5  have made it a contractual violation.
6  Q. Hence, requiring a need to change
7  the contract?
8  A. Correct. Which would have
9  changed overtime, how it would be given out in
10 the garage, so forth and so on.
11 Q. Why not just do that and allow an
12 operator to come in on his regular day off to
13 make up for lost time?
14 A. Because the contract states if
15 you work on your day off you will be paid eight
16 hours at time and one-half.
17 Q. So the union -- you are
18 essentially saying you wanted those operators
19 to keep getting overtime?
20 A. No.
21 Q. Time and a half?
22 MR. CRANER: The union did not
23 want to give up time and a half for overtime
24 under any circumstances.
25 A. On your day off.

Page 61

1  Q. That's your job as president?
2  A. That's my job as president,
3  protect its members.
4  Q. And so what was your idea for
5  resolving it reasonably?
6  A. My idea was let him work four
7  days, and we'll resolve it going forward,
8  possibly in negotiations. Or the first Sunday
9  that Fouche could get off, no matter what it
10 was, he would be forced to take that. It could
11 be the worse run in the garage, it could go
12 through sin city. But if he had Sunday off, he
13 would be forced to take that.
14 Q. And if he worked four days and
15 got three days off, including Sunday, how many
16 hours would he work in a week?
17 A. 32.
18 Q. And how many hours would he be
19 paid for?
20 A. 32.
21 Q. And the union was okay with
22 this?
23 A. I was, yeah.
24 Q. So --
25 A. Until this issue would have been

Page 62

```
 1  resolved one way or another.  That's to try to
 2  preserve his job.
 3          Q.   Was Mr. Fouche okay with working
 4  32 hours a week and getting paid 32 instead of
 5  40?
 6          A.   No, never came up because the
 7  company said no.
 8               MR. CRANER:  That is what I was
 9  going to say.  Did the company accept the
10  proposal?
11          A.   No, the company never accepted my
12  proposal.
13          Q.   The company didn't accept your
14  proposal, as you were saying earlier, because
15  it would increase the costs to the company by
16  filling in that missed work with overtime?
17          A.   Yes.
18          Q.   When a person only works four
19  days a week instead of -- 32 hours instead of
20  40 hours, that eight hours has to be filled by
21  someone; right?
22          A.   Yes.
23          Q.   And it's done on overtime?
24          A.   Well, he was an extra man.  So it
25  would have been -- you know, it could have
```

Page 63

1  changed weekly being he was on the extra board.
2              MR. PHELPS:  Let's just take a
3  brief break, we will mark these as Sullivan-3
4  and 4.
5              (Break taken.)
6              (Exhibit Sullivan-3, May 6, 2008
7  letter to Philip Schuster from Joseph J.
8  Sullivan, was marked for identification.)
9              (Exhibit Sullivan-4, May 6, 2008
10 letter to Philip Schuster from Joseph J.
11 Sullivan, was marked for identification.)
12       Q.    (BY MR. PHELPS:)  Going back on
13 the record.
14              I have marked and put in front of
15 you what is marked as Sullivan-3 and
16 Sullivan-4.  And these are two letters that
17 appear essentially to be the same letter, they
18 are both dated May 6, 2008, they are both
19 signed by you.  Is that correct?
20       A.    Yes.
21       Q.    The only difference, and the
22 reason I put them in front of you, we didn't
23 really or you didn't really recall whether
24 there were two disciplinary grievances filed
25 for Mr. Fouche or just one.

Page 105

```
 1   and be paid for five days a week; is that
 2   correct?
 3           A.   Paid for four days a week.  Paid
 4   for what he worked.
 5           Q.   I'm sorry.  Say that again.
 6           A.   Paid for what he worked.  If he
 7   worked 32, he would be paid 32.
 8           Q.   What were his average daily
 9   hours?  Were they eight hours a day?
10           A.   No.  On the extra board would not
11   have been guaranteed that, no.
12           Q.   I'm sorry.  What were his daily
13   hours?  Were they on average eight hours a
14   day?
15           A.   No.
16           Q.   Okay.  Was it more than that?
17           A.   The reason the 32 provision came
18   up was that an extra board operator now is
19   guaranteed 40 hours per week.  However, if you
20   removed one day from that, he would lose 20
21   percent of that pay, which would be eight
22   hours.
23           Q.   So what was inconsistent?
24           A.   The contract states that an extra
25   board operator shall be paid 40 hours, he would
```

```
                                                    Page 127

 1                C E R T I F I C A T E
 2
 3              I, SEVA FLICSTEIN, a Certified
 4   Shorthand Reporter and Notary Public of the
 5   State of New Jersey, do hereby certify that
 6   prior to the commencement of the examination
 7   the witness was sworn by me to testify the
 8   truth, the whole truth and nothing but the
 9   truth.
10              I DO FURTHER CERTIFY that the
11   foregoing is a true and accurate transcript of
12   the testimony as taken stenographically by and
13   before me at the time, place and on the date
14   hereinbefore set forth.
15              I DO FURTHER CERTIFY that I am
16   neither of counsel nor attorney for any party
17   in this action and that I am not interested in
18   the event nor outcome of this litigation.
19
20         [signature: Seva Flicstein]
21   _____
     New Jersey Certificate No. XI 01413
22   California Certificate No. 8727
     Registered Merit Reporter
23   Certified Realtime Reporter
24   Notary Public of the State of
     New Jersey
25   My commission expires 6/26/2012
```